NATIONAL WESTMINSTER
BANK, PLC, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–758T.

United States Court of Federal Claims.

Nov. 14, 2003.

---

11.   *See* discussion, *supra* Part C.

492

D. Scott Wise, New York City, for plaintiff. Mario J. Verdolini, Jr. and Nancy B. Regan, New York City, and John L. Carr, Jr., Michael C. Moetell, and Thomas M. Buchanan, Washington, D.C., of counsel.

Steven I. Frahm, U.S. Department of Justice, Washington, DC, with whom were Eileen J. O'Connor, Assistant Attorney General, and Mildred L. Seidman, Chief, for defendant.

## OPINION ON PARTIAL SUMMARY JUDGMENT

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for partial summary judgment in connection with this tax refund case. Pre-

viously, in *National Westminster Bank, PLC v. United States,* 44 Fed.Cl. 120 (1999) ("*NatWest I*"), the court ruled that Treasury Regulation 1.882–5 ("Treasury Regulation" or "Regulation"), was inconsistent with Article 7 of the Convention for the Avoidance of Double Taxation, Dec. 31, 1975, U.S.–U.K., 31 U.S.T. 5668 ("U.S.–U.K. Treaty" or "Treaty") and, thus, could not be used for calculating interest deductions by United States ("U.S.") branches of United Kingdom ("U.K.") banks. At issue in the pending cross-motions for partial summary judgment is how to calculate a branch's deductible interest under the U.S.–U.K. Treaty without regard to the Regulation.

In particular, the issues to be decided are: (1) Whether, under the U.S.–U.K. Treaty, the measure of profits of a distinct and separate enterprise .is that of a branch in place, and (2) whether the capital it maintained was adequate to operate as a branch, or whether treating a branch as if it were a distinct and separate enterprise requires the attribution of additional capital to the branch, measured by the regulatory and marketplace capital requirements applicable to separate U.S. bank corporations.

For the reasons that follow, the court concludes that the U.S.–U.K. Treaty does not allow for attribution of additional capital to the branch, as measured by regulatory and marketplace capital requirements applicable to separate U.S. bank corporations. Rather, the Treaty requires the government to use the properly maintained books of the branch to determine each element affecting the profits of the U.S. branch of a U.K. bank during the years at issue, and may only allot additional capital to the branch, if, in fact, capital allotted to the branch was not properly noted on its books as "capital."

## I. The First Summary Judgment Decision

The background facts surrounding the dispute between the parties is discussed in the *NatWest I* decision and will not be repeated here. In brief, this tax refund suit involves the years 1981–1987. National Westminster Bank PLC ("NatWest") charged in its complaint that the Internal Revenue Service ("IRS") had erroneously rejected plaintiff's

interest deduction for interest paid on funds it received from NatWest headquarters and other non-U.S. NatWest branches to conduct its banking operations. NatWest claimed that it was entitled to deduct the interest paid to NatWest headquarters and its non-U.S. branches on these borrowings under the "separate entity" provision of Article 7 of the U.S.–U.K. Treaty.[1]

The relevant provisions in Article 7 are as follows:

(1) The business profits of an enterprise of a Contracting State[2] [e.g., U.K.] shall be taxable only in that State unless the enterprise carried on business in the other Contracting State [e.g., U.S.] through a permanent establishment[3] situated therein. If the enterprise [e.g., plaintiff] carries on business as aforesaid, the business profits of the enterprise may be taxed in that other State [e.g., U.S.] but only so much of them as is attributable to that permanent establishment.

(2) Subject to the provisions of paragraph (3), where an enterprise of a Contracting State [e.g., U.K.] carries on business in the other Contracting State [e.g., U.S.] through a permanent establishment situated therein, there shall ... be attributed to that permanent establishment the profits which it might be expected to make if it were *a distinct and separate enterprise engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment.*

(3) In the determination of the profits of a permanent establishment, there shall be allowed as deductions those expenses which are incurred for the purposes of the permanent establishment, including a reasonable allocation of executive and general administrative expenses, research and development expenses, interest, and other expenses incurred for the purposes of the enterprise *as a whole* ..., whether incurred in the State in which the permanent establishment is situated or elsewhere.

(Emphasis added).

On July 7, 1999, the court issued an opinion and order granting NatWest's motion for partial summary judgment. *See NatWest I,* 44 Fed.Cl. 120. At issue in the initial motion for partial summary judgment was:

[W]hether, in the determination of the interest expense deduction for the U.S. Branch, the interest expense reflected in its books of account—with appropriate adjustments, if necessary, to reflect imputation of adequate capital and arms-length, market interest rates in intra-corporate "borrowing" transactions—may be used in calculating plaintiff's U.S. tax liability, or whether, with respect to interest expense, the defendant may require use of a formulary approach, such as that in [the Treasury Regulation], which disregards intra-corporate "lending" transactions reflected in the books of account.

*Id.* at 123.

Following an analysis of the Treaty, and the pertinent legislative history, including the pre-ratification reports of the U.S. Treasury Department and the Senate, the court concluded that:

[T]he Treaty contemplates that a foreign banking corporation in the position of plaintiff will be subjected to U.S. taxation only on such profits of its U.S. branch and that *such profits should be based on the books of account of such branch maintained as if the branch were a distinct and separate enterprise* dealing wholly independently with the remainder of the foreign corporation, provided that the financial records of the branch, especially those

---

1. The U.S. and the U.K. have recently entered into a new treaty, which is not at issue in this case. Convention for the Avoidance of Double Taxation, July 24, 2001, U.S.–U.K., S. Treaty Doc. No. 107–19 (2002).

2. "Enterprise" is defined in Article 3 of the Treaty to mean, "an industrial or commercial undertaking carried on by a resident of a Contracting State," which, in turn, is defined in Article 3 to

mean, "the United States or the United Kingdom, as context requires."

3. "Permanent Establishment" is defined in Article 5 of the Treaty to include a "branch." It is not disputed for purposes of this motion that NatWest's branch banks in the U.S. are part of a permanent establishment.

reflecting intra-corporate lending transactions, *are subject to adjustment as may be necessary for imputation of adequate capital to the branch and to insure use of market rates in computing interest expense.*

*Id.* at 128 (emphasis added).

Based upon this holding the court determined that the Treasury Regulation is not compatible with the Treaty and, thus, may not be used to determine deductible interest. Following the initial decision, the parties have focused their attention on the issue of "adequate capital." In particular, the parties have disagreed over how to measure the "adequate capital" identified in the original decision for the purpose of determining deductible interest.

## II. NatWest's Branch Bank Operations in the U.S.

### A. Branches Versus Separately–Incorporated Subsidiaries

During the years at issue, foreign banks doing business in the U.S. could choose to conduct their business through branch offices or through separately-incorporated U.S. subsidiaries.[4] Although only branch offices are at issue in this case, NatWest used both approaches during the years in question. With respect to its U.S. branches, NatWest was required to obtain a federal or state license to conduct business in branch form in a particular state. As a condition of its license to do business in the U.S., NatWest

had to maintain separate books, accounts, and records reflecting all transactions effected by or on behalf of the branch.

The regulation of branches of foreign banks is different from the regulation of separately-incorporated foreign bank subsidiaries. Branch banks for the years at issue were subject only to regulation under the Federal Reserve System ("FRS"). During the subject tax years, each U.S. branch of a foreign bank had to file a quarterly "condition report" with the Board of Governors of the FRS and state regulators.[5] U.S. branches of foreign banks were not subject to minimum regulatory capital guidelines or requirements. Rather, U.S. branches of foreign banks were subject to asset pledge and asset maintenance rules that were generally designed to ensure that certain amount of funds would be available to pay creditors and to meet the costs of liquidation in the event regulators had to take possession of the bank.[6]

In contrast to branches of foreign banks, separately-incorporated subsidiaries of foreign banks are regulated like any other U.S. bank. For example, separately-incorporated foreign banks are subject to the same minimum regulatory capital requirements applicable to U.S. banks. In addition, separately-incorporated banks can face sanctions from bank regulators, if they fail to meet regulatory requirements. It is also recognized by both parties, however, that regulators have wide discretion in handling compliance fail-

4. If a foreign bank chose to operate as a separately-incorporated U.S. subsidiary, it could charter the corporation under either federal or state law. Federally-chartered banks were regulated by the Comptroller of the Currency. State-chartered banks were regulated either by their state regulators and the Federal Deposit Insurance Corporation, or if the bank was a member of the Federal Reserve System, by the Federal Reserve System and state regulators.

5. In more recent years federal regulators followed an Examination Manual. Dep't of the Treas. and Bd. of Gov'rs of the Fed. Reserve Sys., *Examination Manual for United States Branches and Agencies of Foreign Banking Organizations* (July 1997). Under the Examination Manual regulators evaluated the strength of the branch by reference to the foreign bank's economic strength.

6. According to John L. Carr and John H. Moore, Jr.:

Asset maintenance provisions typically require a foreign bank to hold assets of a certain type and in a certain amount at a branch. See, e.g., 12 U.S.C. 3102(g)(4) (1982). Asset pledge provisions require a foreign bank to deposit with another bank assets of a certain type and in a certain amount. The deposited funds may not be withdrawn without the bank regulator's prior approval and must be pledged to the regulator so as to provide a disincentive for the foreign bank to default on its obligations and flee the jurisdiction. See, e.g., *id.* § 3102(g)(1)–(3); 12 C.F.R. § 28.6 (1990).

*Conditions of Entry and Forms of Doing Business, in Regulation of Foreign Banks, United States and International, Vol. 1,* § 1.05, n. 85 (Michael Gruson & Ralph Reisner, eds., 1995).

ures, and not all institutions that fall below minimum regulatory capital levels are closed or seriously sanctioned.

The reason that capital requirements vary between branch banks and separately-incorporated subsidiaries stems from the fact that a branch of a foreign bank relies upon the worldwide capital of the enterprise of which it is a part and does not need its own separate capital to operate. If the branch of a foreign bank does poorly, the markets understand that the foreign bank is responsible to bail out the branch.

### B. NatWest's U.S. Branch Operations

With respect to the present case, during the years at issue, NatWest conducted business in the U.S. through six branches: (1) the New York branch, (2) the Nassau, Bahamas branch, (3) the Cayman Islands branch, (4) the International Banking Facility ("IBF") branch, (5) the Chicago branch, and (6) the San Francisco branch.[7] The U.S. branches were engaged in "wholesale" banking which is focused on serving the banking needs of large multinational corporations. NatWest also owned separately-incorporated U.S. subsidiaries. These subsidiary operations were engaged in "retail banking," which generally involves serving the banking needs of individuals and small to medium size businesses.

The capital held by NatWest's branches and subsidiaries varied based upon the dif-

ferent requirements applicable to each. It is not disputed that the consolidated balance sheets NatWest prepared for this litigation indicate in the accounts NatWest designated as "capital" for its branches that the capital ratios (capital/total assets) range from 0.76% to 1.75%.[8] During this same period, NatWest's separately-incorporated subsidiary, National Westminster Bank U.S.A., which was subject to U.S. minimum capital regulations, had capital ratios that varied from 6.03% to 7.19%.

### III. Positions of the Parties

#### A. The U.S.' Position

The U.S. ("government" or "defendant") contends that in order to give meaning to the notion of a "separate and distinct" enterprise under Article 7 of the U.S.–U.K. Treaty, the government should be allowed to treat a branch of a foreign bank as if it were a separately-incorporated bank, for purposes of determining the amount of "capital" the branch is deemed to hold. Under the government's approach, the "capital" appearing on the U.S. branch's books would be adjusted to include such additional capital as the branch would likely hold if it were a separately-incorporated U.S. bank. The government proposes using a "corporate yardstick" to determine the appropriate amount of capital a separately-incorporated branch of the same size would hold. Relying upon the expert report of Dr. John J. Mingo,[9] the government proposes a capital ratio of assets

---

**7.** It is not disputed that the IBF, Nassau and Cayman Island branches were operated from the same New York facilities occupied by the New York branch. The Nassau and Cayman branches were created to avoid the New York State Banking Department's reserve requirements. The IBF branch existed simply as a bookkeeping system under New York law and was limited to international transactions to obtain certain New York State and New York City tax benefits.

**8.** While the parties agree that management of a branch has discretion in determining the assets, liabilities, and capital reported on a balance sheet, they disagree over the extent of that discretion. The government contends that whereas "[c]apital generally does not accrue interest charges ... [d]ebt ... generally carries an interest charge. Given management's discretion regarding the portion of the claims against a division or branch recorded as loans and equity, it

also has discretion regarding the amount of interest expense to be recorded on the books ...." Def.'s Cross Mot. for Partial Summ. J. and Opp'n to Pl.'s Mot. for Partial Summ. J. at 17. NatWest responds that "[w]hile banks may have some discretion in recording assets and liabilities, that discretion, for safety and soundness reasons, is carefully circumscribed by bank regulation and supervision, bank regulatory reporting requirements and bank accounting requirements." Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact at ¶ 26 (citing Bench aff. at ¶¶ 12–16). NatWest further contends that taxpayers are obligated to maintain the books and records upon which their U.S. tax returns are filed. *See id.* at ¶ 25 (citing 26 U.S.C. § 6001)

**9.** The ratios are based on Dr. Mingo's report, which reviews domestic banks of similar size. Dr. Mingo concedes that the domestic banks used for the "corporate yardstick" do not do the

to liabilities of between 6% to 7%. *See* Def.'s Suppl. Summ. J. Br. at 5; Mingo Report at 5. The government asserts that once the correct ratio is set, an appropriate portion of the borrowings the branch received from the head office, as part of its regular banking business, should be treated as if they were "equity capital infusions," and NatWest should not be allowed to deduct interest on that amount.

### B. NatWest's Position

NatWest argues that the U.S.–U.K. Treaty, and relevant legislative history surrounding Article 7, do not allow for the attribution of capital based on a "corporate yardstick" theory. NatWest argues that the Treaty does not allow the taxation of branch profits as determined by a fictional amount of branch capital. Instead, NatWest argues that the Treaty requires that the properly maintained books of the branch be used to determine the taxable profits attributable to the branch as if it were "separate and distinct" from its parent. In this connection NatWest argues a "corporate yardstick" is not needed to give meaning to the phrase "separate and distinct" enterprise. NatWest argues that Article 7 does not allow the taxing authority to impose a capital ratio on the branch that is not based on the reality of the branch's actual circumstances.

### DISCUSSION

### I. Summary Judgment Standard and Standards for Review of Treaties

This case involves the interpretation of a treaty, which is a question of law and appropriate for summary judgment. The underlying questions of contract and treaty interpretation are both questions of law. *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997) (citing *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir. 1996); *Cook v. United States*, 86 F.3d 1095, 1097 (Fed.Cir.1996)). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See* Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

When faced with interpreting treaties, courts are guided by several principles. The goal of treaty interpretation is to "give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties ...." *Maximov v. United States*, 299 F.2d 565, 568 (2d Cir.1962), *aff'd* 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). Courts construe treaties

---

same kind of banking as NatWest's branches. Because there are no domestic banks that do the same type of banking as NatWest's branches, the banks used for the yardstick are not "peer" banks but simply similar in size.

NatWest has submitted the affidavits and expert reports of Dr. Marcia L. Stigum and Dr. Robert R. Bench, which call into question the banks selected by Dr. Mingo for comparison and assert that there was great variation in capital levels among commercial banks engaged in the type of banking conducted by NatWest during the years in question.

[T]he hypothetical regional bank or bank holding company constructs used by Dr. Litan and Dr. Mingo to calculate hypothetical regulatory capital are unrealistic and misleading. The U.S. Branch could not have conducted the same or similar international, wholesale money-center business under the same or similar condition in the organizational form of a regional bank subsidiary or independently-owned bank of similar size in the manner asserted ..., because any such bank would have had to operate on the much smaller capital base of a separately incorporated bank. Bench Supp. Report at ¶ 3.

[Dr. Mingo] has a view that the peer groups, the dominant criteria for peer groups is size. So we're going to then disagree with the $2 billion balance sheet. Except that I'm saying that the $2 billion balance sheet doesn't reflect what was really going on here in terms of the substance of the business and the performance characteristics.

Bench statement, Rec. at 121 (April 30, 2003).

to give effect to their purpose. *United States v. Stuart*, 489 U.S. 353, 368, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989). In this connection, the Supreme Court has consistently held that the court must consider the expectations of both signatories to the treaty, not just the expectations of the U.S. *North West Life Assurance Co. of Canada v. Commissioner*, 107 T.C. 363, 379–80, 1996 WL 711511 (1996) (citing *Stuart*, 489 U.S. at 365–66, 109 S.Ct. 1183; *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)). Accordingly, while the court will give deference to the consistent interpretation of the treaty advanced by the U.S. agencies charged with its administration, their interpretation is not conclusive and will not be adopted by the court if it is not supported by the treaty language or the intent of the parties. *Id.* at 381 (citations omitted).

## II. The Plain Language and Legislative History of the Treaty Do Not Permit the Imputation of Capital to a U.S. Branch of a U.K. Bank Based on Regulatory and Marketplace Capital Requirements Applicable to Domestic Banks

### A. The Plain Language of the Treaty Does Not by its Terms Allow the Government to Impute Capital to a Branch

■ The Treaty states in Article 7(2) that the business profits attributed to a permanent establishment are those "profits that it might be expected to make if it were a separate and distinct enterprise engaged in the same or similar activities under the same or similar conditions ... dealing wholly independently with the enterprise of which it is a permanent establishment." At the crux of this motion is the meaning of the phrase "separate and distinct." Both parties agree that the starting point for determining the branch's profits as a "separate and distinct" entity is the separately maintained books and records of the branch. The parties disagree over the extent to which the Treaty allows the taxing authority to adjust the books and records of the branch. As noted above, the government argues that to give meaning to

the phrase "separate and distinct," the taxing authority is allowed to attribute to a branch the amount of capital that a separately-incorporated bank of the same size as the branch would likely hold. According to the government, the taxing authorities can therefore treat a certain amount of the borrowings the branch received from its head office as equity capital infusions, which do not carry an interest charge, even if, in fact, the branch used the borrowings for bank lending purposes and paid interest to the head office on those funds.

NatWest argues in response that the Treaty, by its terms, does not contemplate that a branch be treated as separately-incorporated bank. NatWest contends that Article 7 assumes that a branch's books and records should be controlling except to the extent that adjustments are required to ensure that the records correctly reflect the true nature of all transactions between the branch and the rest of the bank. According to NatWest, the phrase "separate and distinct" allows the taxing authorities to adjust the books and records of a branch where the branch's books and records are in error with respect to the branch's capital account, or include interest payments that are not consistent with an arms-length relationship between the branch and the rest of the bank of which it is a part. According to NatWest, nothing in the language of Article 7 allows the government to tax the profits of a branch based on outside capital regulatory requirements that do not apply to the branch.

The court agrees with NatWest. There is nothing in the language of Article 7 to suggest that the government is allowed to impose capital requirements on a branch that are the same as those imposed on separately-incorporated banks in order to give meaning to the phrase "separate and distinct." The phrase "separate and distinct" does not mean the branch should be treated as if it were "separately-incorporated," but instead "separate and distinct," means separate and distinct from the rest of the bank of which it is a part. Thus, Article 7 of the Treaty simply allows the taxing authorities to adjust the books and records of the branch to ensure that transactions between the branch and

other portions of the foreign bank are properly identified and characterized for tax purposes. For example, if equity capital infusions are in fact made to the branch and are not properly identified as equity infusions, the taxing authority cannot allow interest payments on those amounts. Similarly, Article 7 allows the books and records of the branch to be adjusted to ensure that interest payments between the branch and other parts of the entity reflect an arms-length relationship. There is nothing in the plain words of the Treaty that allows the government to adjust the books and records of the branch to reflect "hypothetical" infusions of capital based upon banking and market requirements that do not apply to the branch. In short, the government's reading of Article 7 goes too far. Moreover, as discussed below, the government's reading does not reflect the shared expectations of the parties, as evidenced by the legislative history surrounding the Treaty.

### B. The Legislative History of the Treaty Confirms That the Government's Reading of Article 7 Goes Too Far

Both this court and others have recognized that the Organisation for Economic Co–Operation and Development's ("OECD's") 1977 Model Double Taxation Convention on Income and on Capital ("Model Treaty") and the accompanying explanatory Commentary on Article 7 Concerning the Taxation of Business Profits ("Commentary") serve as a meaningful guide in interpreting treaties that are based on its provisions. *See NatWest I,* 44 Fed.Cl. 120; *North West Life,* 107 T.C. at 378 (citing *Taisei Fire and Marine Ins. Co., Inc. v. Comm'r,* 104 T.C. 535, 1995 WL 254425 (1995)). In this connection the Commentary expressly rejects the notion of taxing authorities resorting to "hypothetical" adjustments to the books and records of a branch in determining its taxable profits. In particular, the Commentary states, when discussing Article 7, that:

> In the great majority of cases, the trading accounts of the permanent establishment—which are commonly available if only because a well-run business organization is normally concerned to know what is the profitability of its various branches—will

be used by the taxation authorities concerned to ascertain the profit attributable to that establishment.... [W]here there are such accounts they will naturally form the starting point for any processes of adjustment in case adjustment is required to produce the amount of properly attributable profits. *It should perhaps be emphasized that ... [there] is no justification for tax administrations to construct hypothetical profit figures in vacuo; it is always necessary to start with the real facts of the situation as they appear from the business records and to adjust as may be shown to be necessary the profit figures which those facts produce.*

Commentary at ¶ 11 (emphasis added).

The Commentary goes on to identify some situations where adjustments based on the real facts may be allowed or even required. For example, the Commentary states, "Adjustment of this kind may be necessary ... because goods have been invoiced from the head office to the permanent establishment [or branch] at prices which are not consistent with [market prices].... In such cases, it will usually be appropriate to substitute for the prices used ordinary market prices." Commentary at ¶ 12.

The Commentary confirms that the purpose of any adjustment should be to reflect the real facts of the branch's transactions with the entity of which it is a part. "[T]he general rule should always be that the profits attributed to a permanent establishment should be based on that establishment's accounts insofar as accounts are available which represent the real facts of the situation." Commentary at ¶ 13.

The foregoing discussion demonstrates, contrary to the government's assertions, that the Treaty and the Commentary surrounding Article 7 do not sanction or even contemplate adjustments to the books and records of a branch that are not based on the "real facts of the situation." The Commentary plainly cautions against taxing authorities creating "hypothetical profit figures *in vacuo.*" Commentary at ¶ 11.

In such circumstances, absent some evidence that the government's position is ac-

knowledged by the treaty partners, the court has no basis for allowing the government to attribute "hypothetical" capital to a branch from the home office based on the regulatory and capital requirements that would apply to a separately-incorporated bank. *See North West Life*, 107 T.C. at 397 (citing *Sumitomo*, 457 U.S. at 180, 102 S.Ct. 2374) ("When the language is reasonably clear, as it is in this context, the party proffering a contrary interpretation must persuade the court that its construction comports with the view of both parties."). As discussed below, the additional legislative history that the government relies upon also fails to support its position.

### C. The Treasury Statement and 1975 Senate Report

The government contends that statements made by the Treasury Department and in the Senate Report surrounding the ratification of the Treaty support its position. In 1977, the Treasury Department released a Technical Explanation of the U.S.–U.K. Treaty, in which it stated:

> In determining the proper attribution of business profits under the Convention to a permanent establishment, paragraph (2) provides that both Contracting States will attribute to the permanent establishment such profits as it would reasonably be expected to derive if it were an independent *entity* engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment.

Treasury Department Technical Explanation of the United States and United Kingdom Income Tax Treaty, at 16 (1977) (emphasis added).

The Senate Executive Report, reflecting the Senate's consideration and understanding of the U.S.–U.K. Treaty stated:

> The profits of a permanent establishment are to be determined on an arm's-length basis. Thus, there is to be attributed to it the industrial or commercial profits which would reasonably be expected to have been derived by it if it were an independent entity engaged in the same or similar activities under the same or similar condi-

tions and dealing at arm's length with the resident of which it is a permanent establishment.

Report of the Committee on Foreign Relations, S.Rep. No. 95–18, at 15 (1978).

These unilateral statements by the government are focused on adjustments that the taxing authority may make to the books and records of a branch to ensure that transactions between the branch and head office reflect an arms-length relationship. Neither of these statements suggest that at the time of Treaty ratification the U.S. contemplated that it would be adjusting the books and records of the branch to change the nature of actual transactions between the branch and the head office. There is nothing in the brief statements of the government which suggest that borrowings received by the branch and used for ordinary banking purposes could be re-characterized by the government as "equity capital infusions," when, in fact, they are not. These statements do not suggest that the government may disallow interest deductions based on an amount of capital the branch does not, in fact, hold.

Moreover, even if the court were to read these statements more broadly, the unilateral views of the U.S. are not controlling. As noted above, the court must give meaning to the intent of the treaty partners, not simply the views of the U.S. *See North West Life*, 107 T.C. at 379–80 (citing *Stuart*, 489 U.S. at 365–66, 109 S.Ct. 1183; *Sumitomo*, 457 U.S. at 185, 102 S.Ct. 2374).

### D. Subsequent OECD Statements in 1984, 2001, and 2003

The court further finds, contrary to the government's contentions, that subsequent statements by the OECD in 1984, 2001, and 2003, well after the Treaty was ratified, do not support the government's position. In particular, the government relies on three OECD reports, the 1984 report on "The Taxation of Multinational Banking Enterprises" ("1984 Report"); the "Discussion Draft on Attribution of Profits to Permanent Establishments" ("2001 Discussion Draft"); and the "Discussion Draft on the Attribution of Profits to Permanent Establishments: Part II (Banks)" ("2003 Discussion Draft"). Each will be examined in turn.

### 1. 1984 Report

The 1984 Report expressly discusses the "Inclusion or Exclusion of Interest Payments Between Head Office and Branch." Paragraph 49 states:

> In the case of an enterprise not carrying on the business of borrowing and lending money, there is a good reason to treat interest payments between branches, or between branches and head office as essentially artificial and properly to be ignored in arriving at the arms-length profit of the branch .... *In the case of banks, however, since it is the main business of a bank to borrow money outside the enterprise for the purpose of lending it outside the enterprise there is every reason to suppose that by far the greater part of money lent by head office to a branch and vice versa and money lent by one branch to another will in fact have been borrowed at some stage from an independent third party and will be lent eventually to independent third parties. Thus, the interest taken into account can be regarded as representing real outgoings or receipts of the enterprise as a whole.*

1984 Report at ¶ 49 (emphasis added).

Paragraph 77 states:

> If the head office ... transfers money or other assets to the branch as capital by way of loan, the question arises as to whether interest or other consideration paid for the loan is deductible from the branch's profit. The answer here is "no." The passage quoted from page 76 of the Commentary on the Model Convention precludes the deductibility of interest on capital allotted by head office, and *it can be clearly seen that insofar as such capital is used for the purposes of capital infrastructure of the enterprise as such, rather then for trading purposes of the branch, then the payment of interest on it to head office is no different from interest paid by a branch of a non-banking concern to its head office.*

1984 Report at ¶ 77 (emphasis added).

The 1984 Report also offered additional guidance where "the tax authorities may require a branch to treat part of its funds as allotted capital where the bank legislation in the country concerned does not require it to do so and the branch has not done so." 1984 Report at ¶ 80. The 1984 Report states:

> Under Article 24, paragraph 4 of the Model Convention, the taxation on a permanent establishment in another state should not be less favorably levied than taxation levied on enterprises of that other state carrying on the same activities. If in that other state banking law does not require a resident bank to show allotted capital and the tax authorities cannot require such capital to be shown where the enterprise has not done so of its own accord, the same rule has to be applied to the branch of a foreign bank; consequently, it cannot be required to show allotted capital in its balance sheet.... *[I]n a country where it is necessary or permissible for the tax accounts and the financial accounts of an enterprise to differ [tax authorities may] treat an appropriate part of the payment by a branch of a foreign bank to its head office as remuneration for the use of equity capital, if this is in fact what it does represent and this treatment is not in itself discriminatory, notwithstanding that the financial accounts of the branch do not show such equity capital.*

1984 Report at ¶ 80 (emphasis added).

The court recognizes that the above-quoted sections from the 1984 Report suggest that the government may allot "capital," which does not appear on its books, to a branch and, thus, limit interest deductions in certain circumstances. However, the 1984 Report concludes that this limitation on interest deductions applies only to actual "working capital" provided to the branch by the head office. Thus, paragraph 80 states, "tax authorities [may] treat an appropriate part of the payment by a branch ... to its head office as remuneration for the use of equity capital, *if this is in fact what it does represent, and this treatment is not in itself discriminatory [under Article 24]*." [10] 1984

---

**10.** Article 24, Non–Discrimination:

(1) Individuals who are nationals of a Con-

Report at ¶ 80 (emphasis added). Thus, the 1984 Report does not suggest that the taxing authority can attribute a hypothetical amount of equity capital to the branch based on the amount of capital a separately-incorporated bank of the same size might hold. The 1984 Report states that the amount of equity capital attributed to a branch should equal the amount of equity capital it "in fact" receives from the head office. Thus, the 1984 Report recognizes that the taxing authorities may review the books of the branch and disallow a deduction for interest on the amount of "working capital" the branch receives would be appropriate. This does not, however, give the government the right to attribute to the branch equity capital infusions that it did not "in fact" receive, as measured by the amount of equity capital a domestic bank of similar size might be expected to hold.

Moreover, if the government were to require the attribution of capital to a branch of a bank to meet a "yardstick" capital amount, the government would run afoul of the anti-discrimination provisions of the Treaty as set forth in Article 24. It is not disputed that the government cannot require undercapital-

ized domestic banks to treat a portion of the amounts they borrow as "capital" and, thus, limit the interest deduction that domestic banks make for tax purposes. Thus, it would be discriminatory for the government to require so-called "undercapitalized" branches to treat a portion of their borrowings from their home office as a "capital infusion" for tax purposes.

### 2. 2001 Discussion Draft

The government's reliance on the 2001 Discussion Draft is also unsupported. While it is true that the 2001 Discussion Draft recognizes the government's proposed approach in this case among three proposals for dealing with interest deductions between branch banks and head offices, the 2001 Discussion Draft is ultimately irrelevant to this litigation. First, there can be no doubt that the 2001 Discussion Draft could not and does not reflect the understandings of the Treaty partners in 1975. Subsequent statements made many years later do not reflect intent at the time of ratification. Moreover, the 2001 Discussion Draft expressly acknowledges that the proposals contained in the

---

tracting State and who are residents of the other Contracting State shall not be subjected in that other State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances are or may be subjected.

(2) The taxation on a permanent establishment which an enterprise of a Contracting State has in the other Contracting State shall not be less favourably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities.

(3) Subject to the provisions of paragraph (4) of this Article, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, if reasonable in amount, be deductible for the purpose of determining the taxable profits of such enterprise under the same conditions as if they had been paid to a resident of the first-mentioned State. For the purposes of this paragraph, the term "other disbursements" shall include charges for amounts expended by such residents for the purposes of such enterprise, including a reasonable allocation of executive and general administrative expenses (except to the extent representing the expenses of a type of activity which is not for the benefit of such enterprise, but constitutes "stewardship" or "overseeing" functions undertaken for such resident's own

benefit as an investor in the enterprise), research and development in respect of which such enterprise has the benefits under a cost and risk sharing agreement and other expenses incurred by such resident for the benefit of a group of related enterprises including such enterprise.

(4) Paragraph (3) shall not apply to any interest, royalties, or other disbursements to which the provisions of Article 9 (Associated enterprises), paragraphs (5) and (7) of Article 11 (Interest) or paragraph (5) of Article 12 (Royalties) apply [. . .].

(5) Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of the first mentioned State are or may be subjected.

(6) Nothing contained in this Article shall be construed as obliging either Contracting State to grant to individuals not resident in that State any of the personal allowances and reliefs which are granted to individuals so resident.

Discussion Draft may not reflect "the original intent or historical practice and interpretation of Article 7." 2001 Discussion Draft at ¶ 6. Indeed, the Drafters state that "it may be that clarifying amendments, either to this Article or its Commentary, would be necessary to validate the proposed interpretation." 2001 Discussion Draft at ¶ 49. Thus, by its terms, the 2001 Discussion Draft states that additional negotiations will likely be necessary to finalize the Model Treaty.

In addition, to the issues identified above, the government's proposed approach was largely rejected by the 2001 Discussion Drafters, in any event. The 2001 Discussion Draft advances three proposals under which equity capital could be attributed to a permanent establishment under Article 7 of the Model Treaty. One option is to require a permanent establishment to have at least the minimum amount of capital required for regulatory purposes as would an independent banking enterprise in the permanent establishment's country. 2001 Discussion Draft at ¶ 66. A second approach, which is similar to the approach the government proposes here, is to require a permanent establishment to have the same amount of capital as would an independent banking enterprise carrying on the same or similar activities under the same or similar conditions in the permanent establishment's country. 2001 Discussion Draft at ¶ 67. A third option is to attribute the bank's capital to the permanent establishment on the basis of the proportion that the risk weighted assets of the permanent establishment bear to the total risk-weighted assets of the bank as a whole. 2001 Discussion Draft at ¶ 68. This risk-weighted assets approach, referred to as the "BIS ratio" approach, is based on the 1988 Basel Accord, as modified over time, which has become an internationally accepted approach to measuring risk.[11] 2001 Discussion Draft at ¶¶ 55–57, 63, 68–70.

The 2001 Discussion Draft expressly criticizes the approach that is most similar to the one the government advocates in this case. The 2001 Discussion Draft notes that among the problems of treating the branch as a hypothesized separate enterprise is the fact that the branch "would be smaller than the bank as a whole and so would be compared with similarly small independent banking enterprises," which may not, in fact, "be comparable to a [permanent establishment] that is part of a larger banking enterprise." 2001 Discussion Draft at ¶ 67. The 2001 Discussion Draft goes on to recommend the BIS ratio approach to calculate the free capital to be attributed to a permanent establishment. 2001 Discussion Draft at ¶¶ 82–89.

Given the above-noted statements in the 2001 Discussion Draft, the 2001 Discussion Draft is of no assistance to the court in interpreting the proper scope of the 1975 Treaty. It simply offers no insights into the "genuine shared expectations of the contracting parties ...." *Maximov*, 299 F.2d at 568.[12]

### 3. 2003 Discussion Draft

The government's reliance on the 2003 Discussion Draft to provide meaning to the treaty partners' intent in 1975 is also unsupported. The 2003 Discussion Draft grew out of the 2001 effort,[13] but as the 2003 Discussion Draft explains at the outset, its starting point is the 1984 Report. It then explains that there have been significant changes in

---

**11.** Under the BIS ratio approach, a riskier asset needs more capital to support it than a less risky asset of the same size. 2001 Discussion Draft at ¶¶ 55–57.

**12.** The government contends that to the extent its argument is permitted by the Treaty, it is entitled to deference. *See* Def.'s Cross Mot. for Partial Summ. J. and Opp'n to Pl.'s Mot. for Partial Summ. J. at 42. Because the court finds that the government's position is not consistent with the Treaty and the relevant legislative history of the Treaty, the court does not reach the issue of the amount of deference owed to the government's litigating position in this case.

**13.** It must be noted that the 2003 Discussion Draft is a revised version of the 2001 Discussion Draft that incorporates commentaries received. However, the 2003 Discussion Draft is not complete. The OECD released the revised version of Part II on March 4, 2003, and is still seeking comments on both Parts I, a section dedicated to permanent establishment's in general, and II. A new Part III, a section dedicated to global trading of financial instruments, was also released on March 4, 2003.

the "thinking about the application of the arm's length principle," which is best reflected in the OECD Transfer Pricing Guidelines ("Guidelines") revision in 1995. 2003 Discussion Draft at ¶ 2. Stemming from the Guidelines, the 2003 Discussion Draft "deal[s] with particular issues and situations arising from the widespread financial liberalisation and globalisation of financial markets . . . ." 2003 Discussion Draft at ¶ 2. However, in this connection, the 2003 Discussion Draft rejects the government's suggestion that the tax policy should be to equalize the tax obligations of branches with subsidiaries or other domestic banks. The Discussion Drafters did emphasize that the:

> [A]im of the [working hypothesis] is not to achieve equality of outcome between branch and subsidiary in terms of profits but rather to apply to dealings among separate parts of a single enterprise the same transfer pricing principles that apply to associated enterprises when determining those profits. . . . The legal form chosen, permanent establishment or subsidiary, therefore has some economic effects that should be reflected in the determination of taxable profits.

2003 Discussion Draft at ¶ 5.

The 2003 Discussion Draft notes that "it will not be possible to develop a single internationally accepted approach for making that attribution of capital" because "there are different views on the preferred approach to capital attribution, and so it will not be possible to develop an internationally accepted hierarchy of approaches." 2003 Discussion Draft at ¶ 120. Nonetheless, there is some agreement in the 2003 Discussion Draft that the focus must be on actual risks and facts of the particular branch, not on a hypothetical corporation. *See* 2003 Discussion Draft at ¶ 20 ("Such an approach would have to rely on the bank's own measures of risk and economic capital and such measures do not appear sufficiently well developed to be relied on at the moment"). The 2003 Discussion Draft states that:

> [A]ttribution of capital should be carried out in accordance with the arm's length

*principle, to ensure that a fair and appropriate amount of profits* is allocated to the [permanent establishment]. The purpose of the attribution is to inform the allocation of profits to the [permanent establishment] under Article 7(2). Under the arm's length principle, a bank [permanent establishment], . . . should have sufficient capital to support the functions it undertakes, the assets it uses and the risks assumed. The Report describes a number of different possible approaches . . ., recognizing that the attribution of capital to a [permanent establishment] is not an exact science, and that any particular facts and circumstances are likely to give rise to a range of arm's length results for the capital attributable to a [permanent establishment], not a single figure.

2003 Discussion Draft at ¶ 47 (emphasis added).

In sum, while the 2003 Discussion Draft shows the continued thinking of the OECD on attributing capital to branches and its post–1995 evolving views on arm's length principles, the 2003 Discussion Draft does not reflect the understanding of the 1975 Treaty partners, and is, thus, ultimately irrelevant to the court's conclusion.

## III. The Government's Method Has Been Rejected in Principle by the U.S. Tax Court in the *North West Life* Case

Not only does the government's approach lack support in the plain words of the Treaty and the relevant legislative history, a similar effort by the government to expand the scope of Article 7 to adjust a permanent establishment's books and records based on "hypothetical" facts was rejected *en banc* by the U.S. Tax Court in *North West Life*, 107 T.C. 363, 1996 WL 711511.

*North West Life* involved the determination of the business profits of the U.S. branch of a Canadian insurance company. The treaty language at issue in *North West Life* is nearly identical to Article 7 of the U.S.–U.K. Treaty and was similarly based on the OECD model.[14] The U.S. had taken the position

14. Compare Treaty articles 7(1)–7(3) with articles 7(1)–7(3) of the Convention With Respect to

Taxes on Income and on Capital, Sept. 26, 1980, U.S.–Can., 1986–2 C.B. 258 (quoted in *North*

under Section 842(b) of the IRS Code, that U.S. branches of foreign insurance companies had to report, for federal income tax purposes, investment income based on a hypothetical amount of assets imputed to the U.S. branch. *See* I.R.C. § 842.[15] This hypothetical amount was determined by applying the average asset-to-liability ratios of U.S. insurance companies to the liabilities of the U.S. branch. *North West Life*, 107 T.C. at 374–75. As the government argues in this case, the IRS contended before the Tax Court that section 842(b) did not violate the separate-entity principle because "the formula therein uses petitioner's liabilities to determine the assets petitioner might be expected to hold if it were a separate entity." *Id.* at 386.

The Tax Court expressly rejected the IRS' attempted use of data relating to unrelated U.S. corporations to determine the insurance branch's profits:

> Whether the hypothetical amount of assets calculated pursuant to section 842(b) represents a reasonable estimate of the amount of assets petitioner would hold if it were a separate entity misses the point; that amount is simply extraneous to petitioner's operations.... We are not persuaded that the separate-entity principle is satisfied merely by starting with the real facts as they relate to petitioner's permanent establishment but then incorporating

extraneous data that is inconsistent with that principle.

*Id.* at 386–87. The Tax Court went on to explain the fact that the U.S.' position is "reasonable" is not by itself a ground for sustaining the U.S.' position.[16] Ultimately, the issue is whether the government's position comports with the subject treaty. And in the end, the Tax Court concluded that the U.S.' position failed to comport with Article 7(2) of the U.S.–Canada treaty, "which preclude[d] the fictional allocation of business profits to petitioner's permanent establishment." *Id.*

The government's position in the case at hand contains the same flaws as the government's position in *North West Life*. In *North West Life*, the government used a third party assets-to-liability ratio to impute additional assets and therefore increase income. Here, the government seeks to use a "corporate yardstick" of capital-to-assets ratios to impute additional capital and therefore increase income by reducing deductible expenses. The result is the same. In both cases the government seeks to base the tax on "extraneous data" that do not reflect the real facts. Thus, just as the government's position was rejected in *North West Life*, on the grounds that it was not allowed under an analogous provision of the Canadian Convention, the government's approach here is not permissible under the U.S.–U.K. Treaty.[17]

*West Life*, 107 T.C. at 375–76). The language in Article 7(1)–(3) of the U.S.–Can. Treaty was based on the language of Article 7(1)–(3) of the 1977 Model Treaty. Article 7(1)–(3) of the Model Treaty and related commentary are identical in all relevant respects to Article 7(1)–(3) of the 1963 OECD Model Treaty and related commentary. *See* OECD, *Model Double Taxation Convention on Income and on Capital* (1977); OECD, *Double Draft Taxation Convention on Income and Capital* (1963).

**15.** Under the Internal Revenue Code, a foreign insurance company is required to report its actual "effectively connected" investment income if that amount is higher than the formula amount.

**16.** The government argues that if it cannot impute additional capital to branches of U.K. banks, the branches will be in a better tax position than domestic banks, which must hold a certain amount of capital. This policy concern may or may not be true. However, any policy issue must be addressed by the treaty partners. It cannot be resolved by the court. As noted

above, a treaty is an agreement between treaty partners and must be construed to give meaning to the partners intent. In this connection the court notes that the U.S. and U.K. have negotiated a new treaty which appears to have addressed the capital issue. Convention for the Avoidance of Double Taxation, July 24, 2001, U.S.–U.K., S. Treaty Doc. No. 107–19 (2002).

**17.** Having concluded that the government's position is inconsistent with Article 7 of the Treaty and Article 24, the nondiscrimination provisions, the court does not address NatWest's additional contention that the government's position is also unworkable in contravention of Article 7(5) of the Treaty. Article 7(5) of the treaty provides that "[f]or the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary." Plaintiff argued that:

> Defendant's method appears to require the U.S. branch of a U.K. bank to report profits

## IV. NatWest's Test Is Consistent with the Treaty and Provides a Proper Basis for Determining the Taxable Profits of a Branch

Finally, the government's contention that its position must be adopted because NatWest's "books per-se" test is contrary to the Treaty and its legislative history is unsupported. According to the government, NatWest does not acknowledge the government's right to make any interest-related adjustments to its books and records to properly account for capital. A review of NatWest's briefs in this case demonstrates that the government's characterization of NatWest's position is not correct.

While NatWest argues that the Treaty, together with its legislative history, confirm that branch profits must be based on the properly maintained books of the branch, NatWest goes on to state that this allows the government to adjust the books and records of a branch in certain circumstances. In particular, NatWest agrees that the books can be examined and adjusted where: (1) an interest expense was deducted for advances to the branch that were not used in the ordinary course of its banking business; (2) an interest expense was deducted on amounts designated as capital on its books or on amounts that were in fact allotted to it for capital purposes, such as funding capital infrastructure; and (3) interest paid on inter-branch borrowings was not at arms' length. *See* Pl.'s Resp. to Def.'s Supplemental Summ. J. Br. at 24. Thus, the government's contention that NatWest is tied to an unsupportable "books per-se" test is unfounded.

Moreover, NatWest's position is consistent with the historic position of the U.K., the U.S.' treaty partner.[18] The U.K., which participated as an amicus during briefing on the first summary judgment motion, identified the Inland Revenue Banking Manual ("Banking Manual" or "Manual"), which is published by the Inland Revenue, the U.K.'s equivalent of the IRS, as setting forth the U.K.'s approach. Inland Revenue Banking Manual, Appendix 9A ("Banking Manual") (1994) at ¶¶ 2, 7. The Manual describes the evolution of the U.K. position based on its understanding of the U.S.–U.K. Treaty.

Initially, the U.K. proposed dealing with the issue of branch capital under a formula, known as the "Price Waterhouse" formula ("PW Formula"). Under the PW Formula, a portion of a bank's total "free" capital, i.e. capital that has no associated interest cost, was attributed to a U.K. branch based on the ratio of the U.K. branch's liabilities to the bank's total, worldwide liabilities. Banking Manual at ¶ 3.1. The U.K. abandoned the PW Formula in 1978 after a group of U.S. banks with U.K. branches received an opinion from the Queen's Counsel to the effect that the 1945 U.S.–U.K. Treaty did not give the U.K. the authority to look to the bank's worldwide capital and then "write into branch accounts a level of capital which the branch did not have." Banking Manual at Example 5, Counsel's Opinion 17. As the issue was later explained by the Inland Service:

> [The] 1978 . . . opinion suggested that the Revenue's approach was incorrect, as it went against the hypothesis in the Double Taxation Convention that the U.K. branch was trading under "the same or similar conditions." It was therefore the *actual* conditions which had to be taken into account and no notional capital base could be assumed. . . . From that date our view on how to measure free capital has been revised, and is based on domestic law and Double Taxation Agreements—with the OECD booklets on the Model Double Tax-

---

based on the greater of the profits in its separate accounts, the profits adjusted using bank regulatory requirements applicable to U.S. banks, and the profits adjusted using the capital-to-assets rations maintained by the peer banks. There is no "good and sufficient reason" for the "greater of" feature implicit in Defendant's method.
Pl.'s Mot. for Partial Summ. J. at 33.

**18.** The government argues that the court should consider a recent change in U.K.'s domestic tax law instead of the U.K.'s historic position to determine the meaning of the 1975 Treaty. Reliance on the U.K.'s law change is also misplaced. The tax law changes clearly indicate that the law will not apply to years prior to 2003 and could have no effect on a separate bank capital approach for the years 1981 through 1987 at issue in this case. U.K. Finance Bill § 2(6) (2003).

ation Convention and "Transfer Pricing and Multinational Enterprises–Three Taxation Issues" contributing significantly to our interpretation.

Banking Manual at ¶ 3.2.

The U.K.'s historic position, which is set forth in the Manual, first draws a distinction between "allotted capital," which refers to capital designated as such on the books of a branch and "amounts treated as allotted capital," which, while not designated as capital on the branch's books, should nevertheless be treated as capital. Banking Manual at ¶ 6. The Banking Manual states unequivocally that the free working capital attributed to a branch is the larger of its "allotted capital" or "amounts treated as allotted capital." Banking Manual at ¶ 6.

In this connection, the Banking Manual makes plain that:

[W]here funds are received by the branch from other parts of the group in the ordinary course of banking business, the interest charged to the branch for their use is allowable, so long as it represents an arm's length rate, i.e. the rate which would have operated between independent concerns, provided that they would have undertaken the business in question.

Banking Manual at ¶ 9.321.

The Manual goes on to explain:

[A]s banks make their profits from lending money, the sources of such funds are important. When the bank borrows for on-lending its gross return is limited to a small margin, but where it has sources of "free capital" (such as share capital and retained profits) which have no associated interest costs, the gross return will be the whole interest on lending.... While the free capital available to a bank overall will be apparent, in the UK there is no regulatory requirement that the UK branch of an overseas bank must be given capital.... The question is therefore how do we determine the amount of free capital which has *in reality* been granted to the UK [branch] and on which no interest will be do?

Banking Manual at ¶¶ 2.1–2.2 (emphasis added).

The Manual then states "as a majority of the bank's own capital [the Home Office Bank capital] is likely to be interest-free (share capital, reserves, retained profits) then prima facie capital allotted [to a branch] will also be interest-free...." Banking Manual at ¶ 8.1.

The Manual goes on to state that "it will be necessary to look at amounts which may be treated as allotted capital. The following list is not exhaustive, but may give a flavour to what is involved." Banking Manual at ¶ 10.1. The Manual goes on to identify "premises and fixed assets," [19] "initial working capital," "retained profits [where branches automatically repatriate profits]," "depreciation," and "other reserves" as items that were most likely to involve "capital" and therefore interest payments to the Head Office by the branch for such matters should not be allowed. Banking Manual at ¶ 10.1.

The court finds that NatWest's position, which is consistent with the historic position of the U.K. as set forth in its Manual, represents a correct view of the U.S.–U.K. Treaty and will provide an adequate basis for the parties to resolve the "capital" accounts of the branch and the interest deduction allowed by the branch.

## CONCLUSION

For the reasons set forth above, the government's September 13, 2002 cross-motion for partial summary judgment is **DENIED** and NatWest's July 29, 2002 cross-motion for partial summary judgment is **GRANTED**. The parties shall file a joint status report with the court contact by **December 12, 2003**, setting forth a schedule for resolving the remaining issues in this case.

---

**19.** The Manual states, "If premises are acquired when the branch is set up they are capital assets and prima facie where the funds came from the Head Office it will be treated as allotted capital." Banking Manual at ¶ 10.1. Similarly, the Manual states, "when a branch is set up in the UK it will need more than just premises to commence operation. There will be start up expenses and, as a bank, some amount of working capital will probably be necessary. It is reasonable to suppose that initially this will be met out of capital." Banking Manual at ¶ 10.1.